UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
:
CONRAD P. SEGHERS, :
:
                Plaintiff, :
:     06 Civ. 4639 (GEL)
      -v- :
:     **OPINION AND ORDER**
MORGAN STANLEY DW, INC., d/b/a :
MORGAN STANLEY DEAN WITTER :
DISCOVER, :
:
                Defendant. :
:
------------------------------------------------------x

Charles B. Manuel, Jr. and Shira Y. Rosenfeld,
Manuel & Rosenfeld, LLP, New York, NY
for plaintiff.

Joseph Serino, Jr., Matthew Solum, and
Ryan Morettini, Kirkland & Ellis LLP,
New York, NY, for defendant.

GERARD E. LYNCH, District Judge:

      Plaintiff Conrad P. Seghers, founder and senior manager of hedge funds for Integral Investment Management, L.P. ("Integral"), brings this action against defendant Morgan Stanley DW, Inc., alleging fraud and other tortious conduct arising out of a failed investment brokerage relationship. Defendant moves to dismiss on several grounds, including that plaintiff's claims are time-barred. For the reasons set forth below, defendant's motion will be granted.

## BACKGROUND

      Plaintiff's Second Amended Complaint ("Am. Compl.") alleges the following facts, which must be taken as true for purposes of the motion to dismiss.

In 1999, Integral and Integral Hedging Offshore, Ltd. (IHO) (collectively, the "Integral funds"), entered into an agreement with the Galileo Fund, L.P. and Galileo Fund Offshore, L.P. (collectively, the "Galileo funds"), controlled and operated by Samer M. el Bizri.  Under the agreement, Bizri managed the Integral funds' assets, which were invested in the Galileo funds. (Am. Compl. ¶¶ 19-20.)  In March 1999 and February 2001, Seghers and Bizri, on behalf of the Integral and Galileo funds, entered into agreements with defendant, employing defendant as the principal broker for the Galileo funds.  (Id. ¶ 26.)  The decision to open the accounts with defendant was largely based on the assertion by Morgan Stanley, through its Los Angeles-based employee M. Sonny Matharu, that it would execute Seghers's and Bizri's trading orders accurately and in a timely manner via its prime brokerage department in New York.  (Id. ¶¶ 21, 27.)  The conversations with Matharu were followed by several conversations with New York-based Morgan Stanley prime brokerage employees, who confirmed that the New York department would manage and monitor the Galileo accounts.  (Id. ¶ 24.)

Contrary to these discussions, the accounts were established and managed solely at the Morgan Stanley branch in Burbank, California.  (Id. ¶ 29.)  Moreover, the computer system used to manage the funds was inferior to that used for prime brokerage accounts.  (Id. ¶ 30.)  In February and March of 2001, Seghers and Bizri became aware of errors in their account statements.  (Id. ¶ 32.)  Upon inquiry, Morgan Stanley employees said there was a "glitch" in the system that would be repaired immediately.  (Id. ¶¶ 32-34.)  In May 2001, Seghers visited the New York office and learned that the prime brokerage computer system was not being utilized to manage the Galileo funds.  (Id. ¶¶ 36-37.)  Nonetheless, defendant assured Seghers that the problems only affected the account statements, not the actual transactions or the underlying

status of the funds, and that the errors were being corrected.  (Id. ¶¶ 37-38.)

However, the underlying errors were in fact much more serious, and had come to the attention of Morgan Stanley as early as February 2001.  (Id. ¶¶ 40, 46.)  In the summer and fall of that year, Bizri and Seghers discovered that over 25% of the trades they had placed via phone with Matharu had actually been placed "with the wrong option, or at the wrong strike price, or at the wrong expiration, or not at all."  (Id. ¶¶ 43, 44.)  Bizri and Seghers confronted Morgan Stanley about the errors in June 2001, and Matharu "confess[ed]" to the seriousness of the errors. (Id. ¶ 46.)  More errors were uncovered throughout June, resulting in losses to the funds via the involuntary liquidation of account holdings to satisfy margin calls, as well as the use of capital to attempt to correct errors that would otherwise have been used for profitable trades.  (Id. ¶¶ 47-52.)  As a result, Bizri and Seghers closed the Morgan Stanley accounts in July 2001.  (Id. ¶ 54; see Def. Ex. C.)

Plaintiff filed this action against Morgan Stanley on June 15, 2006, alleging two causes of action.  First, plaintiff claims that Morgan Stanley engaged in fraud by knowingly and falsely representing that (1) all trades were properly placed in accordance with the plaintiff's instructions; (2) errors in the account statements were easily correctable and only errors in the statements themselves; and (3) the value of the hedge funds' assets, as reported to Bizri and relied upon by Seghers, were correct.  (Am. Compl. ¶ 55.)  Plaintiff alleges he suffered at least $35,000,000 in damages as a direct consequence of the fraud, in addition to $30,000,000 in damages as a result of the destruction to his business.  (Id. ¶ 67.)

Second, plaintiff claims that defendant's conduct destroyed his business, name, and reputation.  In support of this claim, he alleges that, in 2001, Morgan Stanley employees

3

communicated with the National Futures Association (NFA), the Securities and Exchange Commission (SEC), and the National Association of Securities Dealers (NASD), and conveyed to those organizations false information about the failed investments, causing the SEC to initiate a lawsuit against him, the NASD to initiate an arbitration action against him, and the NFA to file a complaint against him.[1]  (Id. ¶¶ 70, 72-74; see Def. Exs. H, J, L.)  According to plaintiff, in 2001, Morgan Stanley also inquired into Seghers' dealings with the Art Institute of Chicago, an investor in the Integral funds that later brought suit against Seghers.  (Am. Compl. ¶ 71; see Def. Ex. E.)  As a result of that litigation, Seghers lost control over the Integral funds in 2002.  (Am. Compl. ¶ 62; see Def. Exs. E-F.)  Plaintiff alleges that Morgan Stanley's conduct was the result of its failure to accept responsibility for its actions and making him the "fall guy for its multi-million dollar error, mistakes, losses, and fraud."  (Am. Compl. ¶ 64.)  As a result of the investigations, litigation, and false statements made by defendant, plaintiff claims that his business and reputation have been ruined.  (Id. ¶ 75.)

## DISCUSSION

### I. Legal Standard

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept "as true the facts alleged in the complaint," Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 699 (2d Cir. 1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Thomas v. City of New York, 143 F.3d 31, 36-37 (2d Cir. 1998) (internal

---

[1] The SEC lawsuit resulted in a verdict against Seghers in 2004.  (Am. Compl. ¶ 63; see Def. Ex. K.)  The NFA complaint and NASD arbitration were both settled.  (Def. Exs. I, L.)

quotation marks and citation omitted).  The question for the Court "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996) (internal quotation marks and citation omitted).  All reasonable inferences are to be drawn in the plaintiff's favor, which often makes it "difficult to resolve [the claims] as a matter of law."  In re Indep. Energy Holdings PLC, 154 F. Supp. 2d 741, 747 (S.D.N.Y. 2001).

The task of a court in ruling on a 12(b)(6) motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000) (internal quotation marks and citation omitted).  However, in analyzing the feasibility of the complaint, the court also may rely on documents attached to, incorporated by reference in, or "integral to the complaint . . . without converting the proceeding to one for summary judgment." Holowecki v. Fed. Express Corp., 440 F.3d 558, 566 (2d Cir. 2006) (internal quotation marks and citation omitted).

## II.    The Statute of Limitations

While defendant sets forth several substantial arguments for dismissal, it is unnecessary to go beyond the first.  The complaint must be dismissed because both of plaintiff's claims are manifestly time-barred.

### A.    The Fraud Claim

Defendant argues that, because plaintiff brought this suit more than four years after the alleged fraudulent activity occurred, the fraud claim is barred by the statute of limitations. Plaintiff argues that the fraudulent activity extended as late as 2003, thereby rendering his claim timely.  However, plaintiff misapplies the relevant statute of limitations, which expired, at the

latest, in 2005.

A federal court sitting in diversity must apply the choice of law analysis of the forum state to determine which statute of limitations applies. See Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc., 448 F.3d 573, 582 (2d Cir. 2006), citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). Therefore, New York's choice of law analysis applies.

New York's borrowing statute provides that, when a plaintiff is a non-resident of New York, the applicable statute of limitations is the shorter of New York's limitations period or the limitations period of the state in which the non-resident's claims accrued. See N.Y. C.P.L.R. § 202. See, e.g., Global Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 528 (1999) ("This prevents nonresidents from shopping in New York for a favorable Statute of Limitations."); Freeman v. Bianco, No. 02 Civ. 7525, 2003 WL 179777, at *4 (S.D.N.Y. Jan. 24, 2003) (applying Florida's statute of limitations in a diversity action). As Seghers is a Texas resident (Am. Compl. ¶ 7), and his claim accrued in Texas,[2] the Court must compare the New York and Texas limitations rules.

New York law provides that fraud claims must be brought within the "greater of six years from the date the cause of action accrued or two years from the time" of discovery of the fraud. N.Y. C.P.L.R. § 213(8). However, under Texas law, plaintiffs have four years from the date of the fraud or the discovery of the fraud to bring an action. Tex. Civ. Prac. & Rem. Code § 16.004(a)(4); see also Hunton v. Guardian Life Ins. Co. of Am., 243 F. Supp. 2d 686, 697 n.14

---

[2] Plaintiff does not dispute that the fraud claim, which alleges only economic loss, accrued in Texas where he resides. See Global Fin. Corp., 93 N.Y.2d at 529 (when the plaintiff's only alleged injury is economic, the place of injury is "where the plaintiff resides and sustains the economic impact of the loss").

(S.D. Tex. 2002). Thus, Texas provides the shorter of the limitations periods, and the claim must be dismissed if it is barred by the Texas limitations provision.

Under Texas's limitations provision, the four-year period commences when "a plaintiff learns of a wrongful injury, or of facts that should lead to an investigation." Wingate v. Kerr-McGee Rocky Mountain Corp., 353 F. Supp. 2d 779, 783 (E.D. Tex. 2005); see Kreit v. St. Paul Fire and Marine Ins. Co., No. Civ. A.H-04-1600, 2006 WL 322587, at *3 (S.D. Tex. Feb. 10, 2006) (commencement of limitations period is not dependent on "accru[al]" of "all the resulting damages"), citing Hunton, 243 F. Supp. 2d at 698. Once a plaintiff is aware of his injury, "the limitations clock is running, even if the [plaintiff] does not yet know: the specific cause of the injury; the party responsible for it; the full extent of it; or the chances of avoiding it." Wingate, 353 F. Supp. 2d at 783, citing PPG Indus. v. JMP/Houston Ctr. Partners Ltd., 146 S.W.3d 79, 93-94 (Tex. 2004); Vine St. v. Keeling, 361 F. Supp. 2d 600, 604 (E.D. Tex. 2005) (commencement of limitations period is triggered by "the discovery of the existence of the injury and its general cause, not the exact cause in fact and specific parties responsible"), citing Russell v. Ingersoll-Rand Co., 841 S.W.2d 343, 344 n.3 (Tex. 1992).

In July 2001, as a result of his dissatisfaction with the same errors and deceptions that underlie this fraud claim, plaintiff closed his accounts with Morgan Stanley. (Am. Compl. ¶ 54.) On August 1, 2001, plaintiff's counsel sent defendant a letter accusing defendant of "serious errors" that resulted in "direct and consequential damages" of "as much as $35 million." (Def. Ex. C; see Am. Compl. ¶ 61.) Thus, at least as of August 1, 2001, plaintiff had sufficient knowledge of his injury to cause him to begin investigating its cause; indeed, the August 1, 2001, letter reveals that plaintiff had actually begun that investigation. (See Def. Ex. C

7

(proposing a meeting between plaintiff and defendant to determine the cause for plaintiff's injury); see, e.g., Am. Compl. ¶ 72 ("It was attempted by [plaintiff] to begin [a] detailed analysis of the Morgan Stanley errors in late 2001 . . . .").)  Plaintiff's claim that he did not learn about the specific details of the fraud until 2004 (Pl. Mem. 5) is irrelevant to the limitations analysis, just as it is of no moment that plaintiff did not know the "full extent" of his injury until that time. All that is necessary for the limitations period to commence is knowledge of the "general cause" of the injury, in this case, defendant's mismanagement of plaintiff's accounts.  Accordingly, plaintiff's fraud claim accrued no later than August 1, 2001, and expired, at the latest, on August 1, 2005.  Because plaintiff did not commence this action until June 15, 2006, more than four years after his fraud claim accrued, the fraud claim is time-barred.

      Plaintiff does not dispute that Texas's statute of limitations applies to his fraud claim. (Pl. Mem. 4.)  However, plaintiff makes two arguments in an attempt to avoid the limitations bar. First, plaintiff argues that defendant's fraudulent activity did not end in 2001, but instead was ongoing through 2003 as part of defendant's "persistent, successful efforts . . . to foist responsibility for the disaster it caused upon [him]." (Id.)  Therefore, plaintiff argues that his claim did not accrue until that time.  But this argument confuses plaintiff's two distinct claims. In his complaint, plaintiff alleges that defendant (1) committed fraud in its management of plaintiff's accounts, and then, (2) after plaintiff terminated the brokerage relationship, attempted to cover-up its mismanagement by blaming plaintiff for its errors.  Thus, while the fraud claim focuses on defendant's handling of plaintiff's brokerage accounts (Am. Compl. ¶¶ 31-60), the second claim – for an unspecified tort – focuses on statements defendant supposedly made *after* he terminated his accounts with Morgan Stanley in July 2001.  (Id. ¶¶ 68-76.)  These statements,

8

which allegedly occurred as late as 2004, are separate and distinct from the wrongs that form the basis for the time-barred fraud claim. Indeed, plaintiff essentially concedes this point in his opposition papers, agreeing that "the allegations contained in the second cause of action are separate and distinct from the fraud perpetrated by Morgan Stanley . . . as detailed in the first cause of action; these allegations [in the second cause of action] relate to damage inflicted upon Seghers by Morgan Stanley *after* the termination of their relationship." (Pl. Mem. 9 (emphasis supplied).)

Second, plaintiff argues that his cause of action did not accrue until he actually discovered the full extent of the fraudulent activity in 2003 or 2004 during the course of related litigation and enforcement proceedings. (Id. 4-5.) However, as discussed above, actual knowledge of the full extent of the injury is not required for commencement of the limitations period. Only knowledge of the "general cause" of the injury is required.

Although the statute of limitations may be tolled if a plaintiff was not aware of his injury, plaintiff is not entitled to tolling of the statute of limitations in this case. Texas provides that the statute of limitations may be tolled if the fraud was either (1) "inherently unknowable" and "objectively verifiable" (the "discovery rule"), Computer Assocs. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453, 456 (Tex. 1996), or (2) fraudulently concealed from plaintiff (the "fraudulent concealment doctrine").[3] Velsicol Chem. Corp. v. Winograd, 956 S.W.2d 529, 531 (Tex. 1997). See, e.g., Computer Assocs., 918 S.W.2d at 455 (the discovery rule is a "very limited exception

---

[3] While neither party explicitly addresses the issue of tolling, plaintiff alleges that defendant "withh[eld]" the facts underlying the fraud claim (Pl. Mem. 5-6), thereby arguably invoking the discovery rule or fraudulent concealment doctrine. See Hunton, 243 F. Supp. 2d at 699 n.18.

to statutes of limitation"). However, both the discovery rule and the fraudulent concealment doctrine are satisfied only if the injured party is unlikely to or cannot discover the injury "within the prescribed limitations period" despite reasonable diligence. S.V. v. R.V., 933 S.W.2d 1, 7 (Tex. 1996); see Winograd, 956 S.W.2d at 531 (the limitations period is only tolled "until the fraud is discovered or could have been discovered with reasonable diligence").

      Plaintiff does not allege that the fraud was "inherently unknowable," or that plaintiff, acting with reasonable diligence, could not have discovered defendant's alleged fraudulent activity during the limitations period. See Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 517 (Tex. 1988) (although the statute of limitations is an affirmative defense that must be pled by the defendant, once defendant satisfies its burden, the burden shifts to plaintiff to show why the court should "excuse . . . its failure to file suit"); Prieto v. John Hancock Mut. Life Ins. Co., 132 F. Supp. 2d 506, 515 (N.D. Tex. 2001) (placing burden of proving that the limitations period should be tolled on plaintiff). Indeed, any allegations of fraudulent concealment would be contradicted by plaintiff's assertions that defendant actually confessed at least some of its mismanagement to Seghers himself in May 2001. (Am. Compl. ¶ 37; id. ¶ 50 (alleging that one of defendant's employees apologized to Seghers and told him that defendant was "hiding huge problems").) Cf. Prieto, 132 F. Supp. 2d. at 516 ("[o]nce the plaintiff knows or should have known of the deceit, reliance" on defendant's misrepresentations "is no longer reasonable," and the due diligence requirement is triggered) (alteration in original; internal quotation marks and citation omitted). In addition, according to the complaint, plaintiff actually uncovered some of the fraudulent activity while he was still a customer of Morgan Stanley. (Am. Compl. ¶ 47 ("Morgan Stanley still continued to cover up the disaster, *which was uncovered by Seghers's*

*own staff.*") (emphasis supplied); id. ¶ 48 (claiming that plaintiff sent an email to defendant in June 2001 stating that he had been "cheated and seriously hurt" by defendant).)  Thus, plaintiff can not, and does not, allege that he could not have discovered the activity or that such activity was "inherently unknowable."  To the contrary, the complaint reveals that plaintiff had actual knowledge of the fraudulent activity; indeed, it was this very knowledge that caused plaintiff to terminate his relationship with defendant in July 2001.[4]

Therefore, the statute of limitations should not be tolled in this case, and plaintiff's fraud claim is time-barred.[5]

---

[4] Although plaintiff also alleges that defendant "concealed material facts" with the "intention of inducing Seghers . . . to open" the accounts (Am. Compl. ¶ 57), this allegation is not relevant to plaintiff's fraud claim, which pertains to fraudulent activity committed during the course of the business relationship between plaintiff and defendant, but instead is relevant only to a claim of fraudulent *inducement*, which plaintiff voluntarily abandoned in his amended complaint. (Def. Ex. M at 1-2 ("[W]e consent to the dismissal of Seghers's . . . cause of action[] for fraud in the inducement . . . .").)

[5] Even if plaintiff's fraud claim were not time-barred, it would nevertheless fail because plaintiff lacks standing to bring the claim.  Plaintiff concedes that he is suing in his individual capacity and is not attempting to assert a claim on behalf of the Integral funds, Galileo funds, or related partnerships. (Pl. Mem. 15.)  Indeed, Seghers could not bring a claim on behalf of any of these entities, since he admits that he does not control any of them. (Compare Am. Compl. ¶ 62 (stating that plaintiff lost control over the Integral funds and a receiver was appointed in his place), with Def. Ex. F ¶ 13 (only the receiver has the right to bring and defend lawsuits on behalf of the Integral funds); see, e.g., Am. Compl. ¶¶ 18, 20 (stating that the Galileo funds were "organized by Bizri," not Seghers, and that "Bizri handled the securities trading and investments of the Galileo Fund and GFO").)  It is axiomatic that a party must "assert his own legal rights and interest, and cannot rest his claim to relief on the legal rights or interest of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975).  Thus, Seghers, in his individual capacity, does not have standing to bring the fraud claim, which belongs to third-parties, namely, the limited partnerships in whose names the brokerage accounts were titled. (See Am. Compl. ¶¶ 45, 48, 52, 54 (alleging that defendant's fraudulent activity caused economic loss to the "Galileo Fund Offshore and Galileo Fund").)

Seghers argues that he has standing to sue because defendant's fraud was "directed at [plaintiff] individually as it recklessly and fraudulently destroyed [his] business." (Pl. Mem. 9.)  Even assuming arguendo that plaintiff, as a partner of Integral and IHO, has standing to bring

### B.     The "Destruction of Business, Name and Reputation" Claim

In his second cause of action, plaintiff alleges that defendant "intentionally and recklessly" injured his "business, name[,] and reputation." (Am. Compl. ¶¶ 68-76; Pl. Mem. 14.) Plaintiff does not identify this claim as asserting any familiar cause of action. Instead, plaintiff argues that the Court should analyze his second cause of action as a new, heretofore unrecognized tort. Defendant argues, however, that plaintiff has actually stated a claim for defamation, and because plaintiff is time-barred from bringing a defamation claim, the claim should be dismissed. The Court agrees.

Plaintiff's second cause of action arises from defendant's purported attempt to "pass the buck" for its incompetent or fraudulent practices. (Pl. Mem. 6.) Specifically, plaintiff alleges that, in October 2001, defendant contacted the SEC and instigated an investigation into plaintiff's business which resulted in a verdict against him for securities fraud. (Am. Compl. ¶¶ 63, 72; see Def. Ex. K.) Plaintiff also claims that, in August 2001, defendant inquired into plaintiff's relationship with the Art Institute of Chicago, an investor in the Integral funds,

---

suit in order to "recover for a wrong to his individual interest," Newburger, Loeb & Co. v. Gross, 563 F.2d 1057, 1076 n.23 (2d Cir. 1977), this argument is inapposite to his fraud claim. Plaintiff does not allege in the complaint that defendant's fraudulent activity was "directed" at him *individually*; instead, the alleged fraudulent activity was perpetrated on the *partnerships* that were actually in privity with defendant. Thus, the fraud claim properly belongs to the partnerships, and not plaintiff, because it was the partnerships, and not plaintiff in his individual capacity, that were directly injured by the fraudulent activity. Cf. Cates v. Int'l Tel. & Tel. Corp., 756 F.2d 1161, 1181 (5th Cir. 1985) (claims brought by individual partners are "subsumed within the causes of action of the partnerships" and individual partners are not "afford[ed] . . . a separate, individual cause of action"). Finally, even assuming that defendant directly injured plaintiff after the termination of the brokerage relationship by "foist[ing] its own wrongdoing on [him]" (Pl. Mem. 9), this allegation is relevant only to plaintiff's standing to bring his second cause of action, discussed below. Defendant does not dispute that plaintiff has standing to bring that claim. (Def. Reply 5.)

resulting in the initiation of a NASD investigation during which defendant allegedly "gave false statements" about him and "implicat[ed] [him] . . . as the principal cause[] of the Funds' losses and misreporting to investors," (Am. Compl. ¶¶ 71, 74; see Def. Ex. I), and resulting in his loss of control over the Integral funds. (Am. Compl. ¶ 62; see Def. Exs. E, F.) Plaintiff claims that defendant continued to give such statements to the NASD through 2003. (Pl. Exs. 4, 5; see Pl. Mem. 5.) Finally, plaintiff alleges that defendant contacted the NFA in 2001 and gave that organization "enormous amounts of false information" about him, resulting in the termination of plaintiff's NFA membership in March 2002. (Am. Compl. ¶¶ 70, 73; see Def. Ex. L.) Plaintiff claims that this alleged multi-front attempt to disparage him resulted in "permanent[] damage[]" to his "professional reputation." (Am. Compl. ¶ 75.)

Defendant argues that plaintiff's unnamed tort claim should be analyzed as a defamation claim. Plaintiff responds that defendant's attempt to label his second cause of action as defamation is a "sleight of hand" maneuver that "mischaracteriz[es]" the claim. (Pl. Mem. 6.) But it is plaintiff, not defendant, who is engaged in creative relabeling in an effort to save a time-barred claim. New York law establishes a one-year statute of limitations on defamation claims, which begins to run from the time of the utterance. N.Y. C.P.L.R. § 215(3); see Vasile v. Dean Witter Reynolds Inc., 20 F. Supp. 2d 465, 495 (E.D.N.Y. 1998) (the limitations period commences "on the day the statements at issue were made, not . . . when the plaintiff learns of them").[6] Thus, if plaintiff's second cause of action is properly characterized as a defamation

---

[6] As discussed above, New York's borrowing statute provides that the applicable statute of limitations in this case is the shorter of New York's or Texas's limitations periods. While New York law provides that defamation claims must be brought within one year of the date of utterance regardless of the date of discovery, N.Y. C.P.L.R. § 215(3), under Texas law, plaintiffs have one year from the date of discovery of the defamation to bring suit. Tex. Civ. Prac. & Rem.

claim, the claim must be dismissed as time-barred, since the allegedly defamatory remarks were made between 2001-2003, well over one year before the initiation of plaintiff's suit.

Plaintiff does not dispute that the supposed defamatory remarks occurred over a year prior to initiation of his suit, nor could he, as his complaint and the documents incorporated by reference therein do not allege any defamatory remarks made after 2003. (Am. Compl. ¶¶ 70-72; Pl. Exs. 4-5.) However, plaintiff argues that his claim is not time-barred because it is not properly classified as a defamation claim. Plaintiff argues that his claim is actually an "unnamed" tort that is "based on the principles of New York law enunciated by the New York Appellate Division, First Department" (Pl. Mem. 12, citing Singer v. Jefferies & Co., 553 N.Y.S.2d 346 (1st Dep't 1990)),[7] and therefore is not subject to the one-year statute of limitations applied to defamation claims.

Notwithstanding plaintiff's rejection of a specific label for his second cause of action, the tort of harm to reputation is not "unnamed." It has a name, and the name is defamation. See Green v. CBS Inc., 286 F.3d 281, 283 (5th Cir. 2002) (defamation must result in damage to plaintiff's "reputation, exposing [him] to public hatred, contempt, ridicule, or financial injury")

---

Code § 16.002(a); see Modelist v. Deutsche Bank Nat. Trust Co., No. H-05-1180, 2006 WL 2792196, at *6 (S.D. Tex. Aug. 25, 2006) (applying discovery rule to Texas's one-year statute of limitations period for defamation), citing Kelley v. Riddle, 532 S.W.2d 947, 949 (Tex. 1976). Thus, New York provides the shorter limitations period, which therefore applies to plaintiff's defamation claim.

[7] As an initial matter, plaintiff's reliance on New York law is misplaced, as New York's choice of law analysis dictates that Texas law controls the substantive analysis of plaintiff's claim. See n.8, infra, and accompanying discussion; see, e.g., Seidel v. Houston Cas. Co., 375 F. Supp. 2d 211, 218 (S.D.N.Y. 2005), citing Klaxon, 313 U.S. 487. However, as discussed infra, plaintiff's argument that the Court should interpret his reputational injury claim as an "unnamed" tort lacks merit, regardless of the situs of the controlling law.

(internal quotation marks omitted); Brown v. Petrolite Corp., 965 F.2d 38, 43 n.5 (5th Cir. 1992) (defining libel), citing Tex. Civ. Prac. & Rem. Code Ann. § 73.001. See also Karedes v. Ackerley Group, Inc., 423 F.3d 107, 113 (2d Cir. 2005) ("The gravamen of an action alleging defamation is an injury to reputation.") (internal quotation marks omitted). Indeed, the elements of plaintiff's purported unnamed tort are identical to those of defamation. In order to state a claim for defamation, plaintiff must show that (1) defendant made a false statement about him; (2) defendant published the statement to a third person without legal excuse; and (3) that such publication damaged plaintiff's reputation. Moore v. Waldrop, 166 S.W.3d 380, 384 (Tex. App. 2005).[8] This is exactly what plaintiff is alleging here: the communication of allegedly false statements about him by defendant to various third-parties, which led to the destruction of his

---

[8] As discussed above, New York's choice of law analysis applies in this case. See Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999). In defamation cases, "New York applies the law of the state with the most significant interest in the litigation," as determined by the domicile of the parties and the location where the plaintiff suffered injury. Condit v. Dunne, 317 F. Supp. 2d 344, 352-353 (S.D.N.Y. 2004), quoting Lee, 166 F.3d at 545. Although defendant has its principal place of business in New York (Am. Compl. ¶ 8), and although the alleged defamatory statements were presumably uttered outside of Texas, the balance of factors favors application of Texas law to plaintiff's defamation claim. Plaintiff is domiciled in Texas, was injured in Texas, and has no significant connection with New York. See Condit, 317 F. Supp. 2d at 355 (finding that California law applied to plaintiff's defamation claim because "none of the conduct about which defendant spoke took place in New York, and plaintiff ha[d] no specific connection to New York"). Moreover, Texas "has an interest in protecting its citizens from injury caused by defamatory statements." Id. at 353. Furthermore, although plaintiff disputes that his cause of action should be analyzed as a defamation claim, he does not dispute that, if his claim is interpreted as one for defamation, Texas law controls. (Pl. Mem. 11.) In any case, the choice of law is irrelevant to plaintiff's claim, as plaintiff concedes that "Texas law does not significantly differ from the New York [defamation] law." (Id.) Compare Peters v. Baldwin Union Free Sch. Dist., 320 F.3d 164, 169 (2d Cir. 2003) (under New York law, the elements of a defamation claim include "a false statement, published without privilege or authorization to a third party, constituting fault . . .") (internal quotation marks and citation omitted), with Fiber Sys. Int'l, Inc. v. Roehrs, 470 F.3d 1150, 1161 (5th Cir. 2006) (under Texas law, the elements of a defamation claim include "a false statement about a person, published to a third party, without legal excuse, which damages the person's reputation").

reputation and career.[9] Thus, plaintiff's claim fits squarely within the elements of defamation.

Plaintiff makes two arguments to distinguish his claim from one for defamation. First, he asserts that defendant's conduct, "taken in its entirety," caused him "intentional[] harm." (Pl. Mem. 11.) This argument is a non sequitur. "Defamation is defined . . . as an intentional tort," Williams v. United States, 71 F.3d 502, 506 (5th Cir. 1995), that by its terms necessarily requires an intentional injury to be actionable.

Second, plaintiff argues that torts can be actionable without conforming to a pre-established category, as long as the new tort includes an allegation of "infliction of . . . harm, resulting in damage, without legal excuses or justification." (Pl. Mem. 12, quoting Gantell v. Friedmann, 197 N.Y.S.2d 605, 608 (N.Y. Sup. Ct. 1959).) This may be true, but it is besides the point. Although an "unnamed" tort claim might be available if the defendant caused the plaintiff harm in some way not previously encountered by the law, the law is well-versed in protecting individuals' reputations from intentional harm, and has, over the centuries, honed the requirements for obtaining relief from such harm. See Milkovich v. Lorain Journal Co., 497 U.S. 1, 11-14 (1990) (summarizing the history of defamation law). As such, a plaintiff cannot simply choose to create a new tort that conveniently omits elements of the established tort of defamation that would cause the plaintiff's claim to fail. Courts do not require plaintiffs to conform to the elements of the standard defamation claim out of an empty concern for formalism. Rather, the law simply does not protect a plaintiff's reputational interest when those standards are not met, whatever the label or lack of label plaintiff chooses to attach to his

---

[9] Although plaintiff alleges that the defamatory remarks also caused him economic damage, the injury encompassed by a defamation claim specifically includes "financial" harm. Green, 286 F.3d at 283.

claim.[10]  See, e.g., Bouchet v. Nat'l Urban League, Inc., 730 F.2d 799, 807 (D.C. Cir. 1984) (declining to "create a new tort" because plaintiff's claim "involved substantial elements of . . . defamation" and was therefore time-barred).

Thus, plaintiff's second cause of action is properly analyzed as a defamation claim. Because the claim is time-barred, the Court need not consider the merits of that claim, and the claim is dismissed.[11]

---

[10] At any rate, even if plaintiff's claim could be interpreted as a "new" tort, the claim is nevertheless time-barred. When a party alleges a new tort, under New York law, the Court must apply the statute of limitations that applies to the "most . . . analogous" cause of action. Stern v. BSL Dev. Corp., 557 N.Y.S.2d 89, 89 (1st Dep't 1990); see, e.g., id. (finding plaintiff's claim to be "most closely analogous to a contract cause of action" and applying the relevant statute of limitations); Brewer for Value-Added Commc'ns, Inc. Litig. Trust v. New York, 176 Misc.2d 337, 341 (N.Y. Ct. Cl. 1998) (finding an unnamed tort similar to a conversion claim, and applying the conversion statute of limitations). Plaintiff's so-called "unnamed" tort claim is most analogous to a claim for libel or slander, and claims for libel or slander must be initiated within one year. See N.Y. C.P.L.R. § 215(3). See also Sash v. City of New York, No. 05 Civ. 1544, 2006 WL 2474874, at *6 (S.D.N.Y. Aug. 11, 2006) ("[CPLR] § 215(3) establishes a one-year statute of limitations for intentional torts.").

[11] Plaintiff's second cause of action could also arguably be construed as a malicious prosecution claim, in that plaintiff does not allege injury to his reputation in the abstract, but injury to his specific reputational interest by being made defendant's scapegoat in the proceedings before the SEC, NASD, and NFA. However, even if plaintiff's claim is so construed, it must be dismissed.
First, to prevail on a claim for malicious prosecution, plaintiff must allege and establish, inter alia, the institution of a civil proceeding against plaintiff and the termination of the proceeding in the plaintiff's favor. Texas Beef Cattle Co. v. Green, 921 S.W.2d 203, 207 (Tex. 1996). (Compare Tripodi v. Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, 120 F. Supp. 2d 318, 321 (S.D.N.Y. 2000) (New York choice of law rules require application of the malicious prosecution law of the state where the underlying proceeding on which the claim is based took place), with Def. Ex. J (initiating SEC lawsuit in the Northern District of Texas).) Because a jury found *against* plaintiff in the SEC proceeding (Am. Compl. ¶ 63; Def. Ex. K), plaintiff cannot state a claim for malicious prosecution with respect to that proceeding. Second, because the other actions plaintiff complains of, namely the NASD arbitration and NFA action, did not result in actual litigation, see n.1, supra, and accompanying discussion, they cannot be the basis of a malicious prosecution claim. See Tex. Beef Cattle Co., 921 S.W.2d at 208 (a malicious prosecution claim must be based on "an underlying civil suit"). Finally, even if the

## CONCLUSION

For the foregoing reasons, defendant's motion is granted and the complaint is dismissed.

SO ORDERED.

Dated: New York, New York
       May 10, 2007

                                                         GERARD E. LYNCH
                                                        United States District Judge

---

NASD arbitration, which resulted in a court-approved settlement (Def. Ex. I), could thereby constitute a "civil suit," an action that concludes in a settlement "will not warrant a malicious prosecution" claim. Bertuca v. Martinez, No. 04-04-00926-CV, 2006 WL 397904, at *6 (Tex. App. Feb. 22, 2006).

     Thus, none of the proceedings described in plaintiff's complaint can form the basis for a malicious prosecution claim. See, e.g., Luce v. Interstate Adjusters, Inc., 26 S.W.3d 561, 566 (Tex. App. 2000) ("A party seeking to recover on a malicious prosecution claim must strictly adhere to the elements of the cause of action.").